UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MICHELLE LARACUENTE,                          :

                   Plaintiff,                :          15 Civ. 9583 (AJP)

             -against-                   :          **OPINION & ORDER**

CAROLYN W. COLVIN, Commissioner of Social     :
Security,
                                :

                 Defendant.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Michelle Laracuente, represented by counsel (Binder & Binder), brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security denying her Supplemental Security Income and Disability Insurance Benefits.  (Dkt. No. 1: Compl.)  Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 13: Laracuente Notice of Mot.; Dkt. No. 17: Comm'r Notice of Mot.)  The parties have consented to decision of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 19.)

        For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is <u>DENIED</u>, Laracuente's motion for judgment on the pleadings is <u>GRANTED</u>, and this matter is remanded to the Commissioner for further proceedings consistent with this Opinion.

**<u>FACTS</u>**

**<u>Procedural Background</u>**

        On May 30, 2012, Laracuente filed for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") alleging that she was disabled since April 14, 2010.  (Dkt.

No. 12: Admin. Record filed by the Comm'r ("R.") 225-37.)  On August 27, 2012, the Social Security Administration found Laracuente not disabled.  (R. 143-48.)  On October 15, 2012, Laracuente requested an administrative hearing.  (R. 149-50.)  Administrative Law Judge ("ALJ") Seth Grossman conducted hearings on October 30, 2013 (R. 65-72) and May 12, 2014 (R. 74-116). Laracuente was represented by counsel at each hearing.  (R. 67, 76.)  On August 1, 2014, ALJ Grossman issued a written decision finding Laracuente not disabled.  (R. 30-59.)  ALJ Grossman's decision became the Commissioner's final decision when the Appeals Council denied Laracuente's counseled request for review on October 19, 2015.  (R. 1-4.)

**Non-Medical Evidence & Testimony**

Laracuente was born on January 29, 1978, and was thirty-two years old at the date of the alleged onset of her disability.  (R. 117.)  Laracuente reported that her disabling mental conditions are bipolar disorder, insomnia and post traumatic stress disorder ("PTSD").  (R. 276.) Laracuente's symptoms are crying, anxiousness, being closed in, anger and not "want[ing] to be bothered."  (R. 84, 89.)  Laracuente attends group therapy sessions three times each week for anger management, depression and women's employment.  (R. 92.)

Laracuente lives in the Bronx, with her fiancee, her mother and her three sons, ages eighteen, sixteen and eight years old.  (R. 68, 82.)  Laracuente takes care of her children (R. 285), but her mother and fiancee help take care of her youngest son (R. 69, 82-83).  Laracuente cooks meals two to three times per week (R. 83), but does not clean or perform household chores (R. 83, 287).  Laracuente shops for food once per month, which takes about four hours.  (R. 288.) Laracuente reported that she does not have hobbies or interests, or participate in social activities (R. 84, 288-89), but she window shops and plays games as a coping mechanism when she feels angry or upset (R. 864).  Laracuente walks and takes public transportation, but due to paranoia does not

go outside alone.  (R. 287.)  Laracuente feels angry every day, and her anger causes her to get into arguments with strangers on the street and in the supermarket.  (R. 89-90.)

Laracuente attended school through the eighth grade in a special education program. (R. 277.)  Previously, Laracuente worked as a cellular telephone kiosk manager for Wireless Advocates, but was fired in April 2010 because she asked a co-worker to clock out for her.  (R. 79-80, 298.) Between December 2010 and January 2011 Laracuente worked at Dollar Tree as a cashier, but she left that position because she relocated, and it was seasonal.  (R. 80-81.)  Laracuente testified that she performed the job satisfactorily, but her "anger issue" caused arguments with customers. (R. 81.)

## Medical Evidence[1]

### Dr. Kelly Fiore

On May 18, 2012, Laracuente saw Dr. Fiore at Sound View Throgs Neck Community Mental Health Center.  (R. 403.)  Laracuente reported hypervigilance, paranoia, physical symptoms of anxiety, and irritability.   (Id.)  Dr. Fiore diagnosed bipolar disorder and PTSD on Axis I; personality disorder on Axis II; difficulties with reading and math, and financial and relational difficulties on Axis IV; and a GAF score of 56 on Axis V, which she noted was consistent with

---

[1]     The summarized medical evidence herein only pertains to Laracuente's mental impairments, since she "does not dispute the physical limitations found by the ALJ."  (Dkt. No. 14: Laracuente Br. at 1 n.4.)

4

Laracuente's GAF score of 56 on April 18, 2012. (R. 404.)[2] Dr. Fiore prescribed Zyprexa, as well as Ambien and Klonopin. (R. 405.)

**Dr. Tara Lovings**

Between July 2012 and May 2014, Laracuente regularly saw psychiatrist Dr. Tara Lovings at Montefiore Behavioral Health Center. (R. 374-76, 1170-71.)

On July 20, 2012, Laracuente complained of decreased sleep, low grade paranoia, low frustration tolerance, poor appetite and energy, extreme anxiety, anhedonia,[3] and occasionally seeing shadows. (R. 374.) Laracuente reported childhood physical and sexual abuse, and adult physical abuse. (R. 375.) Dr. Lovings noted that Laracuente was fired due to depression and her inability to focus at her job. (Id.) Dr. Lovings conducted a mental status exam and concluded that Laracuente was well groomed and cooperative, with an up and down mood and depressed affect, logical thought processes without delusions, average intelligence, and intact judgment, insight, memory, executive functioning, attention and concentration. (Id.) Dr. Lovings diagnosed bipolar disorder, PTSD and personality disorder, and opined that Laracuente was "symptomatic but in control." (R. 376.) Dr. Lovings adjusted Laracuente's medication regimen to include trials of Symbax and Xanax, and discontinued her Gabitril and Klonopin prescriptions. (Id.)

---

[2]    A GAF score between fifty-one and sixty indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) at 34 (4th ed. rev. 2000). The Court notes that the Fifth Edition of the DSM, published in 2013, no longer uses GAF scores. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-V) at 16 (5th ed. rev. 2013).

[3]    "Anhedonia" is "total loss of feeling of pleasure in acts that normally give pleasure." Dorland's Illustrated Med. Dictionary at 91 (32d ed. 2012).

On December 4, 2012, Dr. Lovings completed a medical source statement indicating that Laracuente had no restriction to her ability to understand, remember or carry out simple instructions, or make judgments on simple work related decisions. (R. 422-23.) Dr. Lovings found that due to "poor frustration tolerance," Laracuente had marked restrictions on her ability to understand, remember and carry out complex instructions, and make judgments on complex work-related decisions, as well as marked restrictions in her ability to interact appropriately with the public, coworkers and supervisors, and to respond appropriately to usual work situations and changes in routine work settings. (R. 422-23.) Dr. Lovings noted that Laracuente reported "frequent fights and arguments with others known [and] unknown to her." (R. 423.) Dr. Lovings noted that Laracuente's limitations first were present in December 2011. (Id.)

On February 13, 2013, Laracuente reported that she had low energy, enjoyment and motivation, poor appetite, and increased anxiety since she ran out of Symbax and was unable to get more. (R. 1092.) Dr. Lovings conducted a mental status exam and concluded that Laracuente's mood was alright, affect congruent to mood, thought processes logical and goal directed without delusions, memory and judgment intact, and insight fair. (R. 1094.) Dr. Lovings adjusted Laracuente's medication, prescribing Zyprexa and Prozac, as Laracuente's insurance did not cover Symbax, and concluded that although her mood and anxiety symptoms were increased she seemed "in control." (R. 1095.)

On March 8, 2013, Laracuente reported decreased sleep, mood swings, irritability, low frustration tolerance and impulse control, feeling angry and a sense of urgency. (R. 1061.) Dr. Lovings felt that the sense of urgency might be Prozac induced. (Id.) Dr. Lovings conducted a mental status exam and concluded that Laracuente was cooperative and well groomed, but had an upset mood and irritable affect, as well as violent thoughts and impaired concentration. (R. 1063.)

Dr. Lovings discontinued Laracuente's Prozac prescription, increased her Xanax prescription, and added a trial of Lamictal.  (R. 1064.)

On March 22, 2013, Laracuente reported occasional visual hallucinations of shadows, low energy and motivation, anhedonia, poor appetite and low frustration tolerance.  (R. 1032.)  Dr. Lovings noted that Laracuente was "very depressed but tolerating [L]amictal titration." (R. 1035.) Dr. Lovings conducted a mental status exam and concluded that Laracuente had a depressed mood and affect, forgetful memory, mildly impaired judgment, and preoccupied and ruminative thoughts. (R. 1034.)  Dr. Lovings determined that Laracuente should continue Lamictal and added a trial of Wellbutrin to her medication regimen.  (R. 1035.)

On April 5, 2013, Laracuente complained of increased frustration, anger, anxiety, irritability, and emotional sensitivity and reactivity, as well as a lack of enjoyment and social avoidance.  (R. 1001.)  Dr. Lovings noted that Laracuente had fewer hallucinations and was tolerating Lamictal, but that her mood still was low.  (Id.)  Dr. Lovings opined that Laracuente seemed in control, although depressed.  (R. 1004.)  Dr. Lovings increased Laracuente's Lamictal dose, and added a trial of Effexor xr to her medication regimen.  (R. 1004.)  At a follow up appointment on April 8 to discuss adjustments to Laracuente's medication, Dr. Lovings noted that Laracuente was "in good control; but mood not optimal." (R. 999.)

On April 18, 2013, Laracuente reported that she was "doing ok" but had no marked improvement.  (R. 949.)  Laracuente had continued anxiety, low mood and energy, but described her medication and breathing techniques as effective.  (R. 949.)  Dr. Lovings assessed that Laracuente seemed in control but still depressed.  (R. 952.)

On May 3, 2013, Laracuente reported that she had decreased sleep and increased stress that was "overwhelming at times." (R. 856.)  Dr. Lovings conducted a mental status exam and

concluded that Laracuente was well groomed and cooperative, but had a sad, worried mood, anxious affect and forgetful memory. (R. 858-59.) Dr. Lovings again assessed that although stressed, Laracuente seemed in control. (R. 859.) Dr. Lovings increased Laracuente's Effexor xr dose, and renewed her Xanax prescription. (Id.)

On June 7, 2013, Laracuente reported increased anxiety and waking up nearly every day in a panic. (R. 816.) Laracuente described poor appetite, disturbed sleep, low frustration, and decreased energy and enjoyment. (Id.) After conducting a mental status exam, Dr. Lovings concluded that Laracuente had a depressed, anxious, stressed mood with congruent affect, and mildly impaired judgment and forgetful memory. (R. 819.) Dr. Lovings again increased Laracuente's Effexor xr dose. (R. 820.)

On June 20, 2013, Laracuente again reported increased stress and complained of decreased sleep, energy and appetite, and said that she had passive suicidal ideations. (R. 925.) Dr. Lovings opined that Laracuente seemed "in control although stressed," and after a mental status exam concluded that her mood was depressed and her affect fine. (R. 927-28.) Dr. Lovings renewed Laracuente's Xanax prescription. (Id.)

On June 26, 2013, Dr. Lovings completed a psychological impairment questionnaire. (R. 507-14.) Dr. Lovings diagnosed Laracuente with bipolar disorder and PTSD on Axis I, personality disorder on Axis II, migraines and ulcers on Axis III, and poverty and family discord on Axis IV of the multiaxial evaluation. (R. 507.) Dr. Lovings opined that Laracuente's symptoms continued despite group and individual therapy, and medication management. (Id.) Dr. Lovings indicated that her diagnoses were supported by Laracuente's sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia, difficulty thinking or concentrating, and hostility and irritability. (R. 508.) Dr. Lovings noted that Laracuente's reported symptoms were

poor energy, sleeplessness, irritability, blackouts when angry, panic attacks and difficulty concentrating, and that Laracuente said her anxiety prevented her from attending to work and her anger kept her from staying employed.   (R. 509.)

Dr. Lovings opined that Laracuente was not limited in her ability to remember locations and work like procedures, understand and remember one or two step instructions, carry out simple one or two step instructions, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance, make simple work related decisions, ask simple questions or request assistance, respond appropriately to changes in the work setting, or be aware of normal hazards and take appropriate precautions.   (R. 510-12.)   Dr. Lovings further opined that Laracuente was moderately limited in her ability to understand and remember complex instructions and carry out detailed instructions.   (R. 510.)

Dr. Lovings found that Laracuente was markedly limited in her ability to maintain attention and concentration for extended periods, sustain an ordinary routine without supervision, work in coordination with or proximity to others without being distracted, complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and travel to unfamiliar places and use public transportation.   (R. 510-12.)

Dr. Lovings noted that Laracuente experienced episodes of decompensation, in that she "episodically becomes more depressed [and] withdrawn from her activity further."   (R. 512.) Dr. Lovings indicated that Laracuente was prescribed Effexor xr, Neurontin, Omeprazole, Percocet,

Meloxicam, Ambien, Zyprexa, Lamictal, Xanax and Carafate.  (R. 512.)  In Dr. Lovings' opinion, Laracuente was not a malingerer.  (R. 513.)   Dr. Lovings opined that Laracuente was incapable of tolerating even low stress work, her impairments were likely to produce good days and bad days, and she was likely to be absent from work more than three times per month.  (R. 513-14.)

On July 15, 2013, Laracuente was "tearful and emotionally distraught."  (R. 911.) She complained of constant pain, continued depression, and feeling hopeless and angry with low frustration tolerance.  (Id.)  Dr. Lovings assessed that Laracuente was "depressed, in pain and overwhelmed," increased her Effexor dose and renewed her Xanax prescription.  (R. 914.)  At a follow up appointment on July 17, 2013, Laracuente reported that she had a panic attack, and was considering hospitalization.  (R. 907.)  Dr. Lovings opined that Laracuente seemed "worried but in better control."  (R. 910.)

On August 8, 2013, Dr. Mercedes Brito covered Dr. Lovings' appointments.  (R. 885.)  Laracuente reported that she went to the emergency room due to a family trauma, was told she was pregnant, and as a result stopped taking her medication.  (R. 885.)  Dr. Brito opined that Laracuente's mood was angry, and noted that she walked out of the appointment.  (R. 887-88.)  Dr. Brito assessed a GAF score of 59.  (R. 888.)

Dr. Lovings held a crisis intervention appointment with Laracuente on August 12, 2013, as she reported having a seizure-like episode.  (R. 879.)   Laracuente stated that she was off her medication for ten days due to her potential pregnancy.  (Id.)  From a mental status exam, Dr. Lovings concluded that Laracuente's mood was up and down, with affect congruent to mood (R. 881), and noted that she seemed "in control but symptomatic" (R. 882).  Dr. Lovings directed Laracuente to resume her medication regimen and repeat the pregnancy test, and referred her to a neurologist.  (Id.)

On August 14, 2013, Laracuente reported that her third pregnancy test was negative, and she resumed her medications. (R. 797.) Laracuente complained that Ambien was ineffective, and said she had disturbed sleep and decreased sleep time. (Id.) Dr. Lovings conducted a mental status exam and concluded that Laracuente's mood was fair and her affect appropriate, and assessed that she seemed "in control, mood not optimal." (R. 799-800.) Dr. Lovings replaced Laracuente's Ambien prescription with Restoril and increased her Lamictal dose. (R. 800.)

On September 9, 2013, Laracuente reported weight gain and increased appetite, and low mood and energy. (R. 776.) Dr. Lovings opined that Laracuente seemed "stressed and down but in control," and noted that her mood was down with congruent affect. (R. 778-79.) Dr. Lovings renewed Laracuente's Restoril and Xanax prescriptions, and added a trial of Wellbutrin to boost energy and reduce food cravings. (R. 780.)

On September 23, 2013, Laracuente reported going to the emergency room for severe abdominal pain and a "bizarre menstrual cycle," and said she was increasingly preoccupied by her health symptoms. (R. 770.) Laracuente complained that her appetite was increased, and her energy and sleep decreased. (R. 770.) Laracuente had not started taking Wellbutrin yet. (R. 770.) Dr. Lovings noted that Laracuente seemed "stressed but in control," with a worried mood and appropriate affect. (R. 772-73.)

On October 15, 2013, Laracuente reported an episode that resulted in sobbing, coughing, numbness, tremors, hand curling and feet turning inwards, that made her think she was dying. (R. 751.) Laracuente said this was her second such episode, and she thought it was caused by her increased Effexor dose. (Id.) Laracuente reported fair sleep, better controlled appetite and variable energy. (R. 751.) Dr. Lovings opined that Laracuente seemed "in control but worried about her health and other external stressors," and concluded that she had a fair, up and down mood and

calm, pleasant affect.  (R. 754-55.)  Dr. Lovings discontinued Laracuente's Effexor prescription.
(R. 755.)

On May 23, 2014, Dr. Lovings wrote a letter to Laracuente's counsel, Binder &
Binder.  (R. 1170-72.)  Dr. Lovings made the same diagnoses as in the psychiatric impairment
questionnaire she completed on June 26, 2013, and assessed a GAF score of 45.  (R. 1170.)[4/]  Dr.
Lovings noted that Laracuente complained of "sleep disturbance, mood swings, emotional
sensitivity/reactivity, recurrent panic attacks, anhedonia, pervasive loss of interest, poor
concentration/memory and low frustration tolerance that often leads to increased irritability, hostility
and sometimes aggression. . . . [and] intense anger that has carried dissociative 'blackouts.'"  (R.
1170.)  Dr. Lovings indicated that she made several changes to Laracuente's medication with limited
improvement, and that Laracuente went to the emergency room at Einstein MMC for chest pain that
was preliminarily deemed due to anxiety.  (R. 1171.)  Dr. Lovings opined that Laracuente continued
to have limitations in functioning similar to those indicated on June 26, 2013.  (R. 1171.)  Finally,
Dr. Lovings opined that Laracuente was "incapable of tolerating even low work-related stress."  (Id.)

On July 17, 2014, Dr. Lovings wrote an additional letter in response to ALJ
Grossman's request for clarification as to Laracuente's symptoms.  (R. 1173.)  Dr. Lovings stated
that although Laracuente's chart notes stated symptoms, "they may not fully elucidate the
severity/treatment resistance or impact of all her symptoms.  Due to the severity and persistence of
Ms. Laracuente's symptoms, her illness has at times been considered treatment resistant."  (Id.)  Dr.
Lovings noted that Laracuente required a complex medication regimen, and that while "[t]he
dosages may exceed usual dosage and the regimen unconventional, [her] goal [was] to find [the]

---

[4/]     A GAF score of 41 to 50 indicates serious impairment in social, occupational, or school
functioning (e.g., no friends, inability to maintain a job).  See DSM-IV at 34.

most effective pharmcotherapy that will enhance [Laracuente's] quality of life and functionality."
(Id.)  Finally, Dr. Lovings noted that Laracuente showed minor improvements, but continued to
suffer significant psychiatric symptoms and required further care, "including consideration of a
higher level of care, e.g., hospitalization."  (Id.)

### Psychotherapy and Group Therapy

Between May 2012 and October 14, 2013, Laracuente attended psychotherapy
appointments and group therapy with social workers, and health monitoring appointments with
nurses several times each month, and occasionally multiple times each week.  (For progress notes
in chronological order, see R. 406-07, 400-01, 397-98, 395-96, 683-94, 691-91, 388-89, 385-86,
383-84, 381, 329, 377, 374-76, 839-40, 841-43, 836-38, 834-35, 831-33, 1098-99, 1096-97, 1086-
91, 1082-85, 1081-81, 1077-79, 1075-76, 1073-74, 1072-72, 1066-68, 1057-60, 1053-56, 1051-52,
1049-50, 1047-48, 1042-45, 1037-42, 1031-32, 1028-29, 1025-27, 1018-24, 1014-15, 1012-13,
1006-08, 993-95, 990-92, 958-99, 946-48, 943-45, 940-41, 869-74, 866-69, 864-65, 861-63, 853-55,
850-52, 847-49, 821-23, 813-15, 810-12, 806-09, 802-05, 922-24, 919-21, 916-18, 904-06, 902-03,
897-98, 894-96, 824-26, 892-93, 889-91, 883-84, 872-29, 790-92, 787-89, 781-83, 767-69, 756-58.)

### Consultative Physicians

### Psychiatric Review

On August 23, 2012, psychologist T. Harding performed a psychiatric review of
Laracuente's medical records.  (R. 120-26.)  Dr. Harding determined that Laracuente was not
significantly limited in her ability to remember locations and work-like procedures; understand and
remember short and simple instructions; carry out short and simple instructions; perform activities
within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain
an ordinary routine without special supervision; work in coordination with or proximity to others

without being distracted by them; make simple work related decisions; complete a normal workday or work week without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (R. 124-26.)

Dr. Harding further determined that Laracuente was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  (R. 124-26.)  Dr. Harding found that Laracuente had mild restrictions to her activities of daily living; moderate difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence or pace.  (R. 121.)  Dr. Harding determined that Laracuente's symptoms did not precisely satisfy the paragraph A criteria in section 12.04 (affective disorders), 12.06 (anxiety-related disorders) or 12.08 (personality disorders), and found the evidence did not establish the presence of paragraph C criteria. (R. 121.)

Dr. Harding concluded that Laracuente was not disabled (R. 127), and was capable of "simple, entry level rote work in a setting that does not require extensive interpersonal interaction," such as a "salesperson" (R. 126-27).

### Dr. Arlene Broska

Consultative psychologist Dr. Arlene Broska performed a psychiatric evaluation on December 9, 2013.  (R. 1119-23.)  Laracuente reported that she does not sleep much, gets emotional, irritable and fatigued, and feels down almost daily.  (R. 1119.)  Laracuente also reported that she angers easily, throws things, thinks about punching people, often gets in arguments (R. 1120), and

does not like to be around people and does not socialize or like to be outside by herself (R. 1121).

Dr. Broska noted that Laracuente had no medical hospitalizations, but that in 2004 she attempted

to overdose on medication and was hospitalized, and that she sees a therapist and attends group

therapy weekly.  (R. 1119.)

Dr. Broska found Laracuente's demeanor and responsiveness to questions to be

resistant at times, and her manner of relating, social skills and overall presentation to be fair.  (R.

1120.)  Laracuente was casually dressed and well groomed but lethargic and appeared over

medicated.  (R. 1120.)  Dr. Broska opined that Laracuente's speech intelligibility was fluent, her

expressive and receptive language abilities adequate, she was fully oriented, her mood was irritable,

her affect full in range and appropriate in speech and thought content, and her thinking marked by

paranoid thought patterns.  (R. 1121.)  Laracuente's attention and concentration were intact, she

could do counting, simple calculations and serial threes; her recent and remote memory skills were

mildly impaired, she could recall three out of three objects immediately and two out of three objects

after five minutes.  (Id.)  Dr. Broska opined that Laracuente's level of intellectual functioning was

in the average range with a general fund of information appropriate to her experience, with poor

insight and fair to poor judgment.  (Id.)

Dr. Broska concluded that "vocationally there is no evidence of limitation in

following and understanding simple directions and instructions, perform[ing] simple tasks

independently, or maintaining attention and concentration.  There is evidence for moderate

limitation in maintaining a regular schedule and performing complex tasks independently. . . . [and]

relating adequately with others and appropriately dealing with stress."  (R. 1121-22.)  Dr. Broska

concluded that Laracuente's prognosis was guarded, and the results of the examination were

consistent "with psychiatric problems and a history of substance abuse, and these interfere with

[Laracuente's] ability to function on a daily basis without ongoing mental health treatment." (R. 1122.)

### Dr. Edward Halperin

Dr. Halperin reviewed Laracuente's medical records, listened to her testimony at her May 12, 2014 hearing before ALJ Grossman, and testified as a medical expert at the hearing. (R. 96-109.) Dr. Halperin opined that Laracuente's mental status exams were within normal limits, but stated that her medical records were "boilerplate" and lacked anything "resembling a process note as to what's going on." (R. 97-98.) Dr. Halperin opined that Laracuente's Zyprexa dose of thirty milligrams per day was for a "psychotic level," but acknowledged that she "goes to see the clinic five days a week." (R. 98.) Upon questioning by Laracuente's attorney, Dr. Halperin "absolutely" agreed that "the amounts and the dosage of the medications . . . would indicate . . . that [Laracuente] does have more severe psychiatric symptoms." (R. 107.) To reconcile the discrepancy between Laracuente's boilerplate medical records and her medication regimen (R. 101), Dr. Halperin recommended: "we should ask for the treating sources to give a clearer sense of what is actually happening with" Laracuente (R. 99).

Dr. Halperin accepted that Laracuente suffered from PTSD (R. 97-98), bipolar disorder (R. 104), and personality disorder (R. 105), but opined that her anger was indicative of her being an "irritable person rather than having a psychiatric problem," because there was no evidence of police reports or different types of confrontation (R. 105). Dr. Halperin opined that Laracuente did not meet the paragraph B criteria of the listed impairments. (Id.) Dr. Halperin found that Laracuente had moderate impairment to activities of daily living, mild limitations to concentration, persistence and pace, and mild social limitations since she could go to her group therapy commitments. (R. 106.) Dr. Halperin concluded that Laracuente "potentially" could work. (Id.)

**Vocational Expert Testimony**

ALJ Grossman heard testimony from vocational expert Dr. Tites.  (R. 110-15.)  Dr. Tites testified that a hypothetical individual with Laracuente's education and vocational background, who was limited to light work, and simple tasks and instructions, and at most occasional contact with supervisors, coworkers and the public, could work as a mail clerk or a marker.  (R. 111-12.)  If the same hypothetical individual was limited to sedentary work, Dr. Tites testified that she could work as an addresser or document preparer.  (R. 112.)  Dr. Tites testified that if the same hypothetical individual was limited to having no contact with supervisors and coworkers, she would be unable to work.  (R. 112-13.)  Dr. Tites next testified that an individual could not maintain employment if she was off task more than eleven percent of the day.  (R. 113-14.)  Finally, Dr. Tites stated that if an individual was absent more than three times per month on a continuing basis, she could not be expected to perform work.  (R. 114.)

**ALJ Grossman's Decision**

At the first step of the five-step sequential analysis, ALJ Grossman found no evidence that Laracuente engaged in substantial gainful activity since April 14, 2010, the alleged onset date.  (R. 34.)  At the second step, ALJ Grossman found that Laracuente had the following severe impairments: musculoskeletal disorders involving the cervical and lumbar spine and the knees, seizure disorder, migraine headaches, and mood and anxiety-related disorders.  (R. 57.)  At the third step, ALJ Grossman found Laracuente's impairments were not "attended by clinical or laboratory findings, either singly or in combination, which are the same as, or medically equivalent" to a listed impairment.  (R. 58.)  ALJ Grossman determined that Dr. Lovings' May 23, 2014 and June 26, 2013 opinions that Laracuente had marked limitations to functioning and episodes of decompensation

were "unsupported by objective clinical findings" and "inconsistent with the medical evidence of record."  (R. 55, 56.)

ALJ Grossman determined that Laracuente retained the residual functional capacity ("RFC") "to perform light work activity, which does not require exposure to dangerous machinery or heights, which does not require more than occasional contact with supervisors, co-workers and the public, and which consists of simple tasks."  (R. 58.)  ALJ Grossman next determined that Laracuente was unable to perform her past relevant work as a salesperson and cashier.  (Id.)  Based on the Grids and the vocational expert's testimony, ALJ Grossman found that an individual of Laracuente's age, education, work experience and RFC could find jobs in such occupations as mail clerk, marker, addresser and document preparer.  (R. 56-57, 58.)  ALJ Grossman found Laracuente not disabled. (R. 59.)

## ANALYSIS

## I.    THE APPLICABLE LAW

### A.    Definition of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[5/]

---

[5/]      See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010);
(continued...)

An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270.[6/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[7/]

---

[5/]      (...continued)
Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[6/]      See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472; Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[7/]      See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

**B.     Standard of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination.  E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[8/]  "Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'"  Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[9/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[10/]  "[F]actual issues need not have been resolved by the [Commissioner]

---

[8/]     See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[9/]     See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[10/]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174
                                                                                        (continued...)

in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[11/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of

---

[10/]    (...continued)
F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[11/]    See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[12/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[13/]

C.     **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

---

[12/]   Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774;  see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[13/]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700

(2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254

F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

   Further, the regulations specify that when controlling weight is not given a treating

physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must

consider the following factors in determining the weight to be given such an opinion: (1) the length

of the treatment relationship and the frequency of examination; (2) the nature and extent of the

treatment relationship; (3) the evidence that supports the treating physician's report; (4) how

consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the

physician in contrast to the condition being treated; and (6) any other factors which may be

significant.  20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010).[14/]

   When a treating physician provides a favorable report, the claimant "is entitled to an

express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's]

favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an

explanation of why it does not."  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g.,

Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's

failure to consider favorable treating physician evidence ordinarily requires remand pursuant to

Snell but does not require remand where the report was "essentially duplicative of evidence

considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do

---

[14/] See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346-47 (2d Cir. 2005); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

## II.      APPLICATION OF THE LEGAL STANDARD TO LARACUENTE'S CLAIM

Laracuente argues that ALJ Grossman failed to comply with the treating physician rule and provide adequate reasons for the weight given to Dr. Lovings' opinion.  (Dkt. No. 14: Laracuente Br. at 17-20; Dkt. No. 20: Laracuente Reply Br.)

The applicable regulations state that the SSA "will always give good reasons in [the] notice of determination or decision for the weight [the SSA] give[s] [the] treating source's opinion." 20 C.F.R. 404.1527(c)(2); see also, e.g., Duran v. Colvin, 14 Civ. 4681, 2015 WL 4476165 at *8 (S.D.N.Y. July 22, 2015) (Peck, M.J.) (quoting Snell v. Apfel, 177 F.3d 177 F.3d 128, 134 (2d Cir. 1999) (the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not.")).  "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even-and perhaps especially-when those dispositions are unfavorable. A claimant . . . who knows that her physician has deemed her disabled, might be especially bewildered when told by an administrative

bureaucracy that she is not, unless some reason for the agency's decision is supplied." <u>Snell</u> v. <u>Apfel</u>, 177 F.3d at 133.

At Laracuente's May 12, 2014 hearing, Dr. Halperin noted that her medical records were "boilerplate" and lacked anything "resembling a process note as to what's going on." (<u>See</u> page 15 above.) Dr. Halperin stated that Laracuente's Zyprexa dose was a "psychotic level," but acknowledged that she "goes to see the clinic five days a week." (<u>See</u> page 15 above.) Dr. Halperin accepted that Laracuente suffers from PTSD, bipolar disorder and personality disorder. (<u>See</u> page 15 above.) Dr. Halperin agreed with Laracuente's attorney that "the amounts and the dosage of the medications . . . would indicate . . . that [Laracuente] does have more severe psychiatric symptoms." (<u>See</u> page 15 above.) To reconcile the discrepancy between Laracuente's "boilerplate" medical records and her medication regimen (R. 101), Dr. Halperin recommended that, "we should ask for the treating sources to give a clearer sense of what is actually happening with" Laracuente (<u>see</u> page 15 above).

In apparent response to the request for clarification of Laracuente's symptoms and medication regimen, Dr. Lovings wrote a letter on July 14, 2014, stating that her chart notes "may not fully elucidate the severity/treatment resistance or impact of all [Laracuente's] symptoms." (<u>See</u> page 11 above.) Dr. Lovings described Laracuente's symptoms as persistent and severe, and stated "her illness has at times been considered treatment resistant." (<u>See</u> page 11 above.) Dr. Lovings noted that Laracuente required a complex medication regimen with "unconventional" dosages. (<u>See</u> page 11 above.) Finally, Dr. Lovings opined that Laracuente showed "minor improvements," but continued "to suffer significant psychiatric symptoms" requiring further care, "including consideration of a higher level of care <u>e.g.</u>, hospitalization." (<u>See</u> page 12 above.)

Despite Dr. Halperin's conclusion that Laracuente "potentially" could work but that clarification from a treating source would give "a clearer sense of what is actually happening," ALJ Grossman did not address Dr. Lovings' July 14, 2014 letter in his decision, or give any reasons for failing to afford Dr. Lovings' opinion controlling weight.  Similarly, ALJ Grossman's conclusory explanations that Dr. Lovings' May 23, 2014 and June 26, 2013 opinions were "unsupported by objective clinical findings" and "inconsistent with the medical evidence of record" (see pages 16-17 above) do not account for the factors listed in 20 C.F.R. § 416.927(c).  In this case, due to Dr. Halperin's express recognition that the bulk of the medical records were "boilerplate" (see page 15 above), describing a treating physician's favorable report as "inconsistent with the medical evidence of record" is particularly unhelpful to a reviewing court.  ALJs are required to specify the ways in which a treating physician's opinion is inconsistent with the record and should specifically discuss the factors listed in 20 C.F.R. § 416.927(c) when considering the weight to assign to a treating physician's opinion.  See, e.g., Price v. Comm'r of Soc. Sec., 14 Civ. 9164, 2016 WL 1271501 at *4 (S.D.N.Y. Mar. 31, 2016) ("it is reversible error for an ALJ to omit reasons for dismissing the views of a treating physician"); Agins-McClaren v. Colvin, 14 Civ. 8648, 2015 WL 7460020 at *9 (S.D.N.Y. Nov. 24, 2015) (Peck, M.J.); Lebron v. Colvin, 13 Civ. 9140, 2015 WL 1223868 at *19 (S.D.N.Y. Mar. 16, 2015) ("In making this assessment, the ALJ should, again, specifically discuss the factors listed in 20 C.F.R. § 416.927(c) with respect to [the treating physician's] specific findings and opinions."); see also cases cited at pages 22 above.

Remand is required because ALJ Grossman failed to properly apply the treating physician rule with respect to Dr. Lovings' opinion. The Second Circuit "has consistently held that the failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." Sanders v. Comm'r of Soc. Sec., 506 F. App'x 74, 77 (2d Cir. 2012); see

also, e.g., Halloran v. Barnhart, 362 F. 3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); Agins-McClaren v. Colvin, 2015 WL 7460020 at *9; Lebron v. Colvin, 2015 WL 1223868 at *17 ("[r]emand is appropriate to give the Commissioner the opportunity to assess the evidence, applying the correct legal standard.").

Additionally, the medical evidence is clear that Laracuente sees as many as three therapists and mental health professionals per week, in group and individual settings--this fact is obvious from the volume of treatment records covering multiple weekly appointments between May 1, 2012 and October 16, 2013 (see page 12 above), and moreover was identified repeatedly by Dr. Lovings, testified to by Laracuente (see page 2 above), and noted by Dr. Broska who opined that Laracuente's psychiatric problems interfere with her "ability to function on a daily basis without ongoing mental health treatment" (see pages 14-15 above).  In light of vocational expert Dr. Tites' opinion that an individual off task more than eleven percent of the time or absent more than three days per month would be unable to sustain employment (see page 16 above), the frequency of Laracuente's medical treatment is incompatible with the capacity to work.

Again, ALJ Grossman did not explain how he reconciled the discrepancy between his RFC finding and Laracuente's treatment schedule, or provide good reason for his decision to assign no weight to Dr. Lovings' opinion that Laracuente would be absent from work more than three times per month and required further treatment including potential hospitalization.  ALJ Grossman's "error is particularly salient in light of . . . the episodic nature of [Larcuente's bipolar disorder which]. . . . results in [Laracuente] having good days and bad days."  Beckers v. Colvin, 38

F. Supp. 3d 362, 373 (W.D.N.Y. 2014) (citing Matta v. Astrue, 508 F. Appx. 53, 57 (2d Cir. 2013) ("We recognize that a person suffering from bipolar disorder may be vulnerable to . . . 'better days and worse days,' and that a claimant's stability on some days does not necessarily support the conclusion that he is able to work every day.") (emphasis in original)).

On remand, the ALJ should give sufficient explanation for the weight assigned to each treating physician.  See, e.g., Lebron v. Colvin, 2015 WL 1223868 at *25; Miller v. Comm'r of Soc. Sec., 13 Civ. 6233, 2015 WL 337488 at *23 (S.D.N.Y. Jan. 26, 2015).  These reasons must be more than conclusory statements and generic references to the record as a whole.  Sickler v. Colvin, 14 Civ. 1411, 2015 WL 1600320 at *12 (Apr. 09, 2015).  The ALJ must discuss the factors listed in 20 C.F.R. § 416.927(c), identify specific parts of the record with which the treating physician's opinion is not consistent, and explain why that evidence is entitled to greater weight. See Rugless v. Comm'r of Soc. Sec., 548 F. App'x at 700; Lebron v. Colvin, 2015 WL 1223868 at *17, *19.

## CONCLUSION

For the reasons discussed above, the Commissioner's motion for judgment on the pleadings (Dkt. No. 17) is <u>DENIED</u>, Laracuente's motion for judgment on the pleadings (Dkt. No. 13) is <u>GRANTED</u>, and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.

Dated:          New York, New York
                July 26, 2016

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to: All Counsel